J. T. BRIDGES, JR., and DORIS E. BRIDGES, ET AL., 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Bridges v. CommissionerDocket Nos. 1026-77, 1027-77, 1028-77, 1029-77, 1030-77, 1031-77, 1032-77.United States Tax CourtT.C. Memo 1979-290; 1979 Tax Ct. Memo LEXIS 233; 38 T.C.M. (CCH) 1126; T.C.M. (RIA) 79290; August 1, 1979, Filed Hugh R. Dowling and James V. Walker, for the petitioners. Robert J. Shilliday, Jr., for the respondent. SCOTTMEMORANDUM FINDINGS OF FACT*234 AND OPINION SCOTT, Judge: In these consolidated cases, respondent determined total deficiencies in petitioners' Federal income taxes, for the years indicated, in the following amounts: 2DocketCalendarPetitionersNos.YearsTotal DeficiencyJ.T. Bridges, Jr. &1026-771965, 1966,$56,192.80Doris E. Bridges1968--1975Estate of Addie Belle B.1027-771965,19668,207.00Edwards, Deceased, J.T.Bridges, Jr., Co-Executor ( * )Peter F. Edwards ( ** )1028-771965,19668,207.00Charles H. Sabin, III& Marilyn B. Sabin2029-771965--197422,516.45Virginia B. Chandler1030-771969--197541,636.73E. S. Chandler and1031-771963,1964,14,099.33Virginia B. Chandler1966--1968Jack E. Brooks and1032-771963--197567,455.28Janice B. Brooks*235 The issues for decision are: (1) The extent, if any, to which amounts received by petitioners in each of the years here in issue from a long-term timber cutting contract constitute capital gains. This determination depends on the fair market value as of December 29, 1958, of the timber on certain lands in Florida and Georgia which are subject to the long-term timber cutting contract entered into on that date. Therefore, the only question for our decision with respect to this issue is the fair market value of the timber. (2) Whether assessment and collection of the deficiencies in income taxes with respect to petitioners E. S. Chandler and Virginia B. Chandler and petitioner Virginia B. Chandler are barred by the statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. J. T. Bridges, Jr. and Doris E. Bridges, who had their legal residence at the*236 time of the filing of their petition in this case in Jasper, Florida, filed their joint Federal income tax returns for the calendar years 1965, 1966 and 1968 through 1975 with either the office of Internal Revenue Service at Jacksonville, Florida or Chamblee, Georgia. J. T. Bridges, Jr., co-executor of the Estate of Addie Belle B. Edwards, Deceased, had a legal residence at the time of the filing of the petition in this case at Jasper, Florida. Mrs. Edward's Federal income tax returns for the calendar years 1965 and 1966 were filed with the office of Internal Revenue Service, Jacksonville, Florida. Peter F. Edwards, surviving husband of Addie Belle B. Edwards, whose legal residence at the time of the filing of his petition in this case was at Jasper, Florida, filed his Federal income tax returns for the calendar years 1965 and 1966 with the office of Internal Revenue Service at Jacksonville, Florida. Charles H. Sabin, III and Marilyn B. Sabin, whose legal residence at the time of the filing of their petition in this case was Jasper, Florida, filed their joint Federal income tax returns for the calendar years 1965 through 1974 either with the office of Internal Revenue Service*237 at Jacksonville, Florida or Chamblee, Georgia. Virginia B. Chandler, whose legal residence at the time of the filing of her petition in this case was Jasper, Florida, filed her returns for the calendar years 1969 through 1975 either with the office of Internal Revenue Service at Jacksonville, Florida or Chamblee, Georgia. E. S. Chandler and Virginia B. Chandler, whose legal residence at the time of the filing of their petition in this case was Jasper, Florida, filed their joint Federal income tax returns for the calendar years 1963, 1964 and 1966 through 1968 either with the office of Internal Revenue Service at Jacksonville, Florida or Chamblee, Georgia.Jack E. Brooks and Janice B. Brooks, whose legal residence at the time of the filing of their petition in this case was Jacksonville, Florida, filed their joint Federal income tax returns for the calendar years 1963 through 1975 either with the office of Internal Revenue Service at Jacksonville, Florida or Chamblee, Georgia. Prior to his death, J. T. Bridges, Sr. owned approximately 16,324 acres of property located in Hamilton County, Florida and Clinch and Echols Counties, Georgia. These lands were subject to a lease agreement*238 and a timber cutting contract with Owens-Illinois Glass Company (hereinafter referred to as Owens-Illinois) which had been entered into on December 29, 1958, between that company and J. T. Bridges, Sr. and Addie Belle Bridges. The contract became effective as of January 1, 1959. The Florida timber tract had been acquired by J. T. Bridges, Sr. over a period of years beginning prior to 1950 and ending in 1956. This tract consisted of approximately 10,000 acres of land, most of which was forested. Mr. Bridges, Sr. acquired the Georgia tract on October 30, 1950. This tract consisted of approximately 6,400 acres of land, most of which was forested. J. T. Bridges, Sr. acquired a sawmill in the vicinity of Jasper, Florida in 1935. Thereafter, Mr. Bridges began acquiring woodlands. The Florida tract was approximately four miles from the sawmill; the Georgia tract was 35 miles away. Between 1951 and 1958, J. T. Bridges, trading as Bridges Lumber Company, a proprietorship, operated the sawmill, where lumber and pulpwood were processed and sold. Several million board feet of lumber were taken from the Georgia and Florida tracts to be used at the sawmill. Approximately 50 percent*239 of the timber from which the products sold by the sawmill came was taken from J. T. Bridges, Sr.'s own property. The remainder of the timber used by the sawmill was purchased on the open market. Mr. Bridges allowed a neighbor to extract turpentine from some trees, which were later processed as pulpwood. As he thinned his woodlands to improve the growth of the trees, Mr. Bridges processed as pulpwood trees that were unsuitable for sawtimber. The trees that were removed from the Bridges properties for processing as sawtimber were those whose removal was necessary to maintain good forestry practices which improved the growth on his woodlands. Because Mr. Bridges engaged in good forestry practices, his properties were awarded the honorary title of "tree farm" by the American Forestry Association. J. T. Bridges, Sr. did not sell any standing timber prior to his dealings with Owen-Illinois. During the years 1951 through 1958, J. T. Bridges, Sr. elected the provisions of section 631(a), I.R.C. 1954 (and its statutory predecessor). 3 The joint Federal income tax return of J. T. Bridges, Sr. and Addie Belle Bridges for the calendar year 1958 showed on Schedule*240 D under "Long-Term Capital Gains and Losses--Assets Held More Than 6 Months" as the first item "Gain on culling of timber ( IRC Sec. 631(a) -- attached), Timber -- $2,125.69, Pulpwood -- $11,531.37." The attached schedule showed, in part, under "Recapitulation of Depletion" the following: Recapitulation ofCost DepletionDepletionNo. UnitsPer UnitTotalTimber CutEligible forcapital gains69,720$ 4.511 $ 314.51Ineligible forcapital gains761,69130.72823,405.30Pulpwood CutEligible forcapital gains2,404.611.2042,896.29Ineligible forcapital gains1,586.065.7619,138.03*241 Recapitulation ofJan. 1, 1958 ValuesProfitDepletionPer UnitTotalOn CuttingTimber CutEligible forcapital gains $35$ 2,440.20$ 2,125.69Ineligible forcapital gains3526,659.193,253.89Pulpwood CutEligible forcapital gains614,427.6611,531.37Ineligible forcapital gains69,516.36378.33On March 13, 1958, the sawmill owned by J. T. Bridges, Sr. was destroyed by fire. After the fire, J. T. Bridges, Sr. approached representatives of Owens-Illinois with respect to selling to that company the timber on the Florida and Georgia tracts. Mr. Bridges' negotiations with representatives of Owens-Illinois culminated in the timber cutting contract which became effective on January 1, 1959. The timber cutting agreement contained the following terms: The Bridges agreed to sell and Owens-Illinois agreed to buy timber from the 16,324.7 acres in Hamilton County, Florida and in Clinch and Echols Counties, Georgia for a term of 66 years commencing on January 1, 1959 and ending on December 31, 2024. Owens-Illinois was granted the exclusive right to cut and remove all timber of every species together with free and unlimited*242 logging privileges. This contract provided in part: 3. Bridges have this day sold and Owens-Illinois has this day purchased and paid for 9,221,579 board feet of pine timber suitable for saw logs, situated upon the above described lands, measuring 11.1 inches or over in diameter, 4-1/2 feet above the ground, at the fixed price of $30.00 per thousand board feet (Scribner Decimal C. Scale), and Bridges acknowledge receipt of the payment of $276,647.37 cash in full payment for said 9,221,579 board feet. As used in this Contract, the term "contract year" shall mean and have reference to a calendar year during the term of this Contract, which term commences with the year 1959 and ends with the last day of the year 2024, unless said term be sooner terminated in a manner hereinafter provided. Said 9,221,579 board feet of pine timber is the equivalent of 27,664.74 cords under conversion table set forth in Paragraph 5 hereof, and for the purposes of this Contract said 9,221,579 board feet shall be treated as a credit of 27,664.74 cords of prepaid stumpage belonging to Owens-Illinois, thus constituting a backlog of timber paid for but not cut at the beginning of the term of this Contract, *243 to which backlog shall be added the annual purchases of timber for which provision is hereinafter made. In addition to said present sale, Owens-Illinois agrees to purchase from Bridges, each contract year during the said sixty-six year term of this Contract, a quantity of timber from the above descrbed lands equal to one cord multiplied by the number of acres of said lands covered by this Contract during such year, and Owens-Illinois agrees to pay to Bridges, within 20 days after the commencement of each contract year, the purchase price of the quantity of timber which Owens-Illinois is thus obligated to purchase from Bridges during such contract year, which purchase price shall be computed pursuant to Paragraph 4 hereof and paid to Bridges as follows; within 20 days after the commencement of each contract year, Owens-Illinois shall pay to Bridges a sum equal to $4.50 multiplied by the number of cords which Owens-Illinois is obligated to purchase during such year pursuant to this Paragraph 3, and within 30 days after the average of the Wholesale Price Index, referred to in Paragraph 4 hereof, for the last preceding calendar year is available to Owens-Illinois, Owens-Illinois shall*244 compute the adjusted purchase price of said number of cords pursuant to said Paragraph 4 and pay to Bridges the said adjusted purchase price of said number of cords less the amount theretofore paid with respect thereto during such contract year, if such adjusted purchase price be more than such previous payment; if such adjusted purchase price be less than such previous payment, Bridges shall, on demand of Owens-Illinois, forthwith refund to Owens-Illinois the difference between such adjusted purchase price computed as aforesaid and said previous payment made to Bridges during such contract year. The title to such timber shall pass from Bridges to Owens-Illinois as and only when such timber is severed from the lands. 4. The purchase price for all timber to be bought and sold hereunder (other than said present sale of 9,221,579 board feet) shall be Four and 50/100 ($4.50) Dollars per cord; provided, however, that if the average of Wholesale Commodity prices as reported in the wholesale Price Index for all Commodities (1947-1949 equals 100) as published by the U.S. Department of Labor, Bureau of Labor Statistics, for any calendar year beginning with the calendar year 1959, shall*245 be as much as five per cent (5%) greater or less than the index figure of 119, then the purchase price per cord for the next ensuing contract year shall be increased or decreased by the same percentage that the index figure for all commodities for such preceding calendar year shall be greater or less than 119; and provided, further, that at no time shall such purchase price be less than Three and 78/100 ($3.78) Dollars per cord. * * * * * *6. * * * Should Owens-Illinois during any year cut and remove an aggregate volume in excess of one cord per acre, and Owens-Illinois shall have a credit for wood paid for but not cut during prior years, then such excess cut shall be charged against such credit for prior years, to the extent that the credit exists. Should Owens-Illinois during any year cut and remove from the lands timber in excess of one cord per acre in the aggregate, and not have sufficient credits from prior years to cover such excess cutting, then within sixty (60) days after the commencement of the next succeeding contract year, Owens-Illinois shall pay to Bridges for such excess cut at the purchase price specified in Paragraph 4 hereof. Should Owens-Illinois, at*246 the termination of any contract year, have a backlog of credits of wood paid for but not cut equal to 2500 cords or more, it may take credit for payments made for excess stumpage in prior years by deducting the payment for such excess stumpage, or any part thereof, from any annual payment due Bridges, so long as the amount paid Bridges is not reduced below one cord per acre per year average over the term of this Contract. * * *8. Owens-Illinois agrees, at its cost and expense, to manage and operate said lands for the production of timber in such manner as shall, in the opinion of Owens-Illinois, be in accord with the best forestry practices from time to time prevailing. 9. Owens-Illinois has, pursuant to Paragraph 3 hereof, purchased from Bridges all of the pine timber suitable for saw logs now measuring 11.1 inches and over in diameter, 4-1/2 feet from the ground, and now growing upon the above described lands, and it is stipulated and agreed by the parties that Owens-Illinois is now the absolute and unconditional owner of such timber now growing upon said lands, with the right to cut and remove the same at any and all times during the term of this Contract. The contract*247 further provided that Owens-Illinois would not during the last 5 years of the 66-year term of the contract cut and remove timber from the property to such an extent as to reduce the standing and growing merchantable timber to less than 75 percent of the quantity on the lands at the date of execution of the contract. Owens-Illinois had a timber cruise conducted of the timber on the lands.The cruise was made in September 1958. A copy of this cruise was furnished to the Bridges. The contract provided that if the Bridges were dissatisfied with the cruise they had the option of having a second cruise conducted, and the average of the quantity of merchantable timber shown by the two cruises would be deemed to be the quantity of merchantable timber standing and growing on the property as of the contract date. If the Bridges had a cruise conducted, the contract required that their cruise except all pine timber suitable for sawlogs and measuring 11.1 inches and over in diameter, 4-1/2 feet from the ground. "Merchantable timber" was defined to mean all pine timber four inches and over in diameter at breast high (DBH) and all hardwood and cypress timber six inches and over DBH. The Bridges*248 did not have a second cruise made. The report of the cruise which Owens-Illinois had made showed the following number of trees in various DBH and the volume in standard cords of pulpwood and pine sawtimber in Scribner Decimal "C" board feet on the Hamilton County, Florida property and on the Clinch and Echols Counties, Georgia property: HAMILTON COUNTY, FLORIDA PROPERTYPineCypressHardwoodDBHPulpwoodPulpwoodPulpwoodTreesVolume TreesVolumeTreesVolume4172,5192,0082,734182,448246206,2066,45370,5181,80650,3891,211 8150,99312,12434,8522,31623,9411,47610116,98217,93820,7042,86113,8731,738121,5183218,065 1,6716,6281,1951467232,1276362,3916671647114471591,2323871887341938722910720228111223423244969Total648,41938,912139,6409,554101,4427,008PineCombinedSawtimber"Hardwood"TotalScribnerNo.DBHPulpwoodPulpwoodDecimal "C"CullsTreesVolumeTreesVolumeTreesVolume45,18242177,7012,0506120,9073,0 17327,1139,470434858,7923,792209,78615,9161,3641034,5774,599151,55922,5372,3061 214,6932,86616,2113,18737,363338,7361,055144,5181,3034,5851,3265,13672,4111,027161,679 5461,72655762614,574292184221945092281995,84015420228111228111331,311223423 34232449694969104Total241,08216,562889,50155,47443,357432,8726,736[sic]*249 CLINCH and ECHOLS COUNTIES, GEORGIA PROPERTYPineCypressHardwoodDBHPulpwoodPulpwoodPulpwoodTreesVolumeTreesVolumeTreesVolu me4117,4541,4106146,5554,67226,35365026,4255748106,5588,10716,9101,14531,3942,0231069 ,48710,15913,9702,04114,2502,090128751734,1388244,52095314136407522172,606822162751031,100499184002222011672222624242934441,06524,56162,4275,01480,8377,279PineTotalSawtimber"Hardwood"TotalScribnerNo.DBHPulpwoodPulpwoodDecimal "C"CullsTreesVolumeTreesVolumeTreesVolume4117,4541,410652,7781,224199,3335,896979848,304 3,168154,86211,2752,3401028,2204,13197,70714,2902,126128,6581,7779,5331,95031,6272 82,386239143,3581,0393,4941,07910,800151,786161,3756021,3756022,50954,2225518400222 4002223037,841201167211672652,40222262426242429342934261,979143,26412,293584,32936,85445,330500,6165,739*250 The report explained that the cruisers had shown sawtimber classifications of cypress and hardwood on the cards they had prepared from which the report was prepared, but these classifications shown on these cards were not used in the report inasmuch as the inventory authorized desired only pulpwood classification for this category. The report also stated that a stem judged to be 50 percent or more cull was classified simply as a cull stem. Generally, in the forestry industry a tree 10 inches DBH is considered to be sawtimber. The cruise report was made in late September 1958. A summary contained in the cruise report showed the following total volumes of merchantable timber: FloridaGeorgiaTotalTractTractPropertyPine Pulpwood (Standard Cords)38,91224,56163,473Cypress & Hardwood (StandardCords)16,56212,29328,855Total Cords55,47436,85492,328Pine Sawtimber(Scribner Decimal "C" Bd.Ft.)432,872500,616933,488 ( * )Number of Culls6,7365,73912,475Attached to the report was the volume table used to compute the number of cords of pulpwood from each size class of trees and*251 the Scribner Decimal "C" board feet. The report also contained a breakdown of the significant pine stocking stem count of less than merchantable size trees by class size on both the Hamilton County, Florida property and the Clinch and Echols Counties, Georgia property. The class size ranged from zero to one foot high to three inches DBH. The following is a summary of the number of significant reproduction stems on the property as shown by the cruise report: No. of "significant" reproduction stemsFloridaGeorgiaSpeciesTractTractTotal TractLongleaf Pine139,96466,528205,692Slash Pine503,040557,5711,060,611Other Pine11,56513,82625,391Total Pine Stems653,769 [sic]637,9251,291,694The following is a summary of the number of stems in the various size categories as shown in the report with the approximate age of each such stem: ApproximateSizeAgeNumber0-1 Feet270,4221.Foot -- 5 Feet3326,7685 Feet -- Up4324,9262-Inch DBH5346,3963-Inch DBH8223,182Total1,291,694The 116,982 pine trees in the class 10-inch DBH on the Hamilton County, Florida property could*252 produce 6,083,064 board feet of sawtimber, and the 69,487 pine trees in the class 10-inch DBH on the Clinch and Echols Counties, Georgia property could produce 3,613,324 board feet of sawtimber. The following schedule shows the number of board feet which could be produced from the 10-inch DBH and above cypress and hardwood trees on the Hamilton County, Florida property as shown in the report: CYPRESSHARDWOODDBHNo. TreesVol. B.F.DBHNo. TreesVol. B.F.1020,704641,8241013,873499,428128,065475,835126,628437,448142,127233,970142,391243 ,8821644767,944161,232190,9601819339,5651822945,342202022861,10422223411,08424244919,747Total1,459,138Total1,508,995The following schedule shows the number of board feet which could be produced from the 10-inch DBH and above cypress and hardwood trees on the Clinch and Echols Counties, Georgia property as shown in the report: CYPRESSHARDWOODDBHNo. TreesVol. B.F.DBHNo. TreesVol. B.F.1013,970433,0701014,250513,000124,138244,142124,520298,3201475282,720142,606265,8 121627541,800161,100170,500181840079,200202011631,0882222268,476242911,94824Total813,680Total1,366,396*253 Had the class 10-inch DBH trees been used for sawtimber along with larger trees, the topwood from the cutting of the pine trees on the Hamilton County property would be 8,000 cords and the topwood from the cutting of the cypress and hardwood on this property would be 657 and 679, respectively. Under the same circumstances, the pine topwood from the Georgia property would be 6,675 cords and the cypress and hardwood would be 366 and 615, respectively. Under the terms of a lease agreement executed simultaneously with the timber cutting agreement, Owens-Illinois agreed to lease the timber tracts at an annual rental equal to the amount of the ad valorem taxes assessed each year. A cost of approximately $1.50 per acre per year would be a realistic figure for forest management, and $.60 per acre would be a reasonable expense for real property taxes. There are three national forests in Plorida.The Apalachicola National Forest is located near Tallahassee, Florida. The Osceola National Forest is located near Jacksonville, Florida and is closer in proximity to the Bridges' Hamilton County, Florida and Clinch and Echols Counties, Georgia properties than any of the other Florida national*254 forests. The Ocala National Forest is located south of Gainesville, Florida. The Government sells to individuals both pulpwood stumpage and sawtimber stumpage from its various national forests. The following schedule shows the number of sales, the volume in cords, the average price for the South, and the Florida and Georgia average price of pulpwood stumpage sold from national forests for the years 1958 and 1959: No.VolumeYearSalesCordsSouthFloridaGeorgia1958240382,958$5.73$6.97$4.121959296355,7245.606.926.08The following schedule shows the average prices received from southern pine sawtimber stumpage together with the number of sales and volume in thousands of board feet Scribner, with the average price in the south and the average price in Florida and Georgia sold from national forests for the years 1958 and 1959: VolumeNo.M.Bd.Ft.YearSalesScribnerSouthFloridaGeorgia1958330373,727$31.91$30.42$31.171959337357,84236.0533.7938.66The following schedule shows certain selected sales of pine pulpwood, pine sawtimber, and cypress sawtimber sold*255 from Osceola National Forest on the dates indicated, together with the number of cords sold, volume of board feet sold and total value: PINEVol.ValueValueDateCordsPer Cd.Vol. MBFPer MBFTotal Value9-582,280$8.3762.39$35.76$21,314.673-59229 tops7.38398.4639.3715,687.375-592,2888.5314.5442.9020,140.417-591,2468.8718.15 34.5011,678.208-591,8558.388.3934.5015,834.368-592,0568.7317,948.889-591,2629.1611,559.92CYPRESSDateVol. MBFValue MBFTotal Value3-5912.02$28.94 $ 347.865-5966.0025.001,650.008-5922.9624.96573.082-6012.0031.26375.122-6013.0025.00325.003-6021.0028.76603.96On June 25, 1959, the Military Department of the State of Florida sold 750,000 board feet or hardwood sawtimber at $30 a thousand board feet. There was little demand for pulpwood from cypress and hardwood trees. A cord of pulpwood from such timber had a value as of December 29, 1958, of $2.50 per cord. J.T. Bridges, Sr. died on Apil 6, 1962. Between December 29, 1958, and the date of his death, Mr. Bridges*256 had received $570,462.29 in payments under the timber cutting contract with Owens-Illinois, including the $276,647.37 paid for the 9,221,579 board feet of 12-inch DBH sawtimber. On July 3, 1963, the executors of the Estate of J. T. Bridges, St. filed an estate tax return with the District Director of Internal Revenue Service in Jacksonville, Florida. The Florida and Georgia tracts subject to the lease agreement and timber cutting contract were reported on Schedule A, Real Estate, of the estate tax return at a value of $682,588.54. Respondent determined the fair market value of these lands to be $1,225,354. The estate paid the estate tax deficiency based on respondent's determination and sued for a refund in the United States District Court for the Middle District of Florida. The jury found the fair market value of the lands subject to the timber lease to be exactly as the estate tax return showed, $682,588.54. 4The will of J.T. Bridges, Sr. devised and bequeathed an individual one-half interest in the Florida and Georgia timber tracts subject*257 to the cutting contract and lease to Addie Belle Bridges, and an undivided one-eighth interest in these lands to each of his children, J.T. Bridges, Jr., Janice B. Brooks, Virginia B. Chandler, and Marilyn B. Sabin, to be held in trust for each child until he or she reached age 35. The income from the portion of these timber tracts held in trust for each of the children of J.T. Bridges, Sr. was to be paid annually to that child until the child reached the age of 35, when the child would receive a one-eighth undivided interest in 3he property if it were still a part of the trust corpus. In 1963, the Estate of J.T. Bridges, Sr. received a contract payment of $73,453.73 from Owens-Illinois and distributed this amount to each of the five beneficiaries of the Estate of J.T. Bridges, Sr. in accordance with his or her proportionate interest in the assets of the estate. On December 27, 1963, the County Judges Court of Hamilton County, Florida authorized the Estate of J.T. Bridges, Sr. to distribute assets to Addie Belle Bridges having a total value of not in excess of $200,000. In accordance with this authority granted by the court, the Estate of J. T. Bridges, Sr. distributed a 171/683 interest*258 in the timber tracts in Florida and Georgia subject to 3he lease agreement and the timber cutting contract to Addie Belle Bridges who in turn transferred said interest to J.T. Bridges, Jr., Janice B. Brooks, Virginia B. Chandler, and Marilyn B. Sabin equally. During the calendar years 1964, 1965, and 1966, Addie Belle Bridges had a 170.5/683 interest in the timber tracts in Florida and Georgia subject to the lease agreement and 3he timber cutting contract and the remaining 512.5/683 interest was equally divided among J.T. Bridges, Jr., Janice B. Brooks, Virginia R. Chandler, and Marilyn B. Sabin. In each of the years 1964, 1965, and 1966, the Estate of J. T. Bridges, Sr. received payments pursuant to the lease agreement and the timber cutting contract of $73,453.73. The contract proceeds received by the Estate of J.T. Bridges, Sr. were distributed to the five beneficiaries of the estate in accordance with their proportionate interest in the estate assets. During the calendar years 1967 and through 1975, Addie Belle Bridges no longer had any interest in the timber tracts in Florida and Georgia subject to the lease agreement and the timber cutting contract, and J.T. Bridges, Jr. *259 , Janice B. Brooks, Virginia B. Chandler, and Marilyn B. Sabin each had a one-quarter interest in the property. The payments received under the timber cutting contract and the lease agreement subsequent to the death of J.T. Bridges, Sr. on April 6, 1962, are as follows: YearAmount1963$ 73,453.73196473,453.73196573,453.73196673,453.73196773,461.41196878,480.61196977,701.07197079,664.53197182,766.22197285,867.93197373,461.15197492,461.051975105,457.56Petitioners, E.S. Chandler and Virginia B. Chandler, and respondent executed agreements in writing pursuant to the provisions of section 6501(c)(4) extending the period for the assessment of tax due as follows: Ending Dates of Extended Period of Limitations ForDates ofAgreements1963196419661967196812-21-6712-31-684-1-6812-31-689-6-681 2-31-6912-31-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-31-7012-31-704-28-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-28-7012-31-7112-31-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-31-711 2-31-7110-31-7112-31-7212-31-7212-31-7212-31-7212-31-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-31-7612-31-7612-31-7612-31-7612-31-76Petitioner, Virginia*260 B. Chandler, and respondent executed agreements in writing pursuant to the provisions of section 6501(c)(4) extending the period for assessment of income tax due as follows: Ending Dates of Extended Period of Limitations ForDates ofAgreements19691970197119728-14-7512-31-7612-31-7612-31-7612-31-76Petitioners reported the amounts received under the timber cutting contract in each of the years here in issue as capital gains. Respondent determined that under the principles announced in Rev. Rul. 62-81, 1962-1 C.B. 153, the gains realized by each petitioner as a result of the payments received pursuant to the timber cutting contract constituted sales of timber entitled to capital gain treatment only to the extent of the fair market value of the timber existing at the time of the execution of the timber cutting contract, i.e. December 29, 1958. Respondent determined that the fair market value of the timber in existence as of that date was $718,093.37. As of January or February of 1965 the payments received by J.T. Bridges, Sr., his estate and the beneficiaries thereof had exceeded $718,093.37. Accordingly, respondent*261 determined that a portion of the payments received in 1965 by each petitioner as a result of the timber cutting contract constituted ordinary income. In addi3ion, he determined that all of the payments received thereafter constituted ordinary income. Respondent therefore increased each petitioner's taxable income for the years 1965 and thereafter to reflect the ordinary income received pursuant to the timber cutting contract. In addition, respondent increased the amount of taxable income reported by petitioners E.S. Chandler and Virginia B. Chandler and Jack E. Brooks and Janice B. Brooks for the years 1963 and 1964 to account for understatements in 3he amount of capital gains received as a result of the Owens-Illinois contract. ULTIMATE FINDINGS OF FACT The fair market value of the timber subject to the long-term cutting contract on the two Bridges tracts as of December 29, 1958, was $1,210,328, which we have determined as follows: Cords of pine50,051pulpwoodX $8.00 per cord = $ 400,408Cords of cypress &15,409hardwood pulpwoodX $2.50 per cord =38,523MBd ft pine9,809.63sawtimber ( * )X $35.00 per MBd ft =343,315MBd ft cypress2,272.82sawtimberX $25.00 per MBd ft =56,820MBd ft hardwood2,876.39sawtimberX $30.00 per MBd ft =86,262Value of unmerchantable stems285,000Total$1,210,328*262 OPINION The issue here is purely factual. Petitioners in their brief make some argument that all payments received under the contract should be capital gains. However, they recognize that Rev. Rul. 62-81, 1962-1 C.B. 153, which was approved by the Court of Appeals for the Fifth Circuit, Dyal v. United States,342 F.2d 248 (5th Cir. 1965), holds that a contract similar to the one here involved accomplished a sale of timber existing at the time of its execution and that, provided the conditions of sections 1221 or 1231 were met, the payments equal to the fair market value of the timber existing as of the contract date constitute capital gains. Payment in excess of the fair market value of the timber as of the contract date, however, are not proceeds of the sale of timber, but rather are consideration for the use of land and constitute ordinary income. See also Bridges v. Commissioner,64 T.C. 968, 971 (1975),*263 in which we stated with respect to payments under the same contract here in issue that "The parties agree that receipts from Owens-Illinois in the taxable years 1963 and 1964 are taxable under the provisions of Rev. Rul. 62-81, 1962-1 C.B. 153." As in the above-cited Bridges case, there is no issue between the parties as to basis of the timber. The parties, however, disagree drastically as to the fair market value of the timber on the land on December 29, 1958. Petitioners contend that the fair market value of the timber on the land on December 29, 1958, is $2,867,111. This amount of value which petitioners contend includes the timber for which Mr. Bridges was paid $276,647.37 when the contract was entered into. Respondent contends that the value of the timber on the land as of that date is not more than $800,951 less the $276,647.37 which Mr. Bridges received in cash.Respondent takes the position that the sale of 9,221,579 board feet of pine sawtimber in excess of 11.1 inches DBH was not part of the long-term timber cutting contract, but was rather a side transaction. This side transaction, respondent argues, was an arm's-length sale of a block of timber between*264 a willing seller and a willing buyer, the sales price of which, as a matter of law, fixes the fair market value of all sawtimber on the property. Accordingly, although respondent admits that the prices paid for some of the timber under 11.1 inches DBH was less than the fair market value of the timber subject to the cutting contract because of Owens-Illinois' obligations to pay the ad valorem taxes and to practice good forestry procedures, these considerations should not, respondent argues, come into play in valuing the 9,221,579 board feet of pine sawtimber in excess of 11.1 inches DBH, which were not subject to the timber cutting contract or any other sawtimber on the property on December 29, 1958. Petitioners view the 9,221,579 board feet of pine sawtimber over 11.1 inches DBH as part of the timber subject to the contract.Petitioners characterize the $276,647.37 payment as a down payment, arbitrarily set to accommodate J.T. Bridges, Sr.'s immediate needs for cash. They assert that this block of timber would not have been sold butfor the timber cutting contract and point out that the contract itself states that the 9,221,579 board feet of pine sawtimber constitutes "a*265 backlog of timber paid for but not cut at the beginning of the term of this contract." Moreover, petitioners point out, in the notice of deficiency the $276,647.37 payment was included as part of the fair market value and argue that if this were truly a separate sale independent of the longterm timber cutting contract, these proceeds should not have been included. Accordingly, petitioners argue that this timber should be considered in determining the fair market value. In our view, the value of the 9,221,579 board feet of pine sawtimber should not be included as part of the fair market value of timber subject to the long-term timber cutting contract. We have quoted in our findings the relevant provisions of the contract. The contract does not speak in terms of a down payment of $276,647.37. Rather, it unambiguously speaks of a "present sale of 9,221,579 board feet" of pine sawtimber. Moreover, one of petitioners' witnesses, a former representative for Owens-Illinois who participated in the negotiations culminating in the timber cutting contract with J. T. Bridges, Sr., stated that the sale of 9,221,579 board feet was just a sale of a block of timber, independent of the long-term*266 timber cutting contract. That petitioners might not have sold this block of timber at the agreed-upon price but for the provisions of the accompanying long-term timber cutting contract does not render the 9,221,579 board feet of pine sawtimber part of the timber cutting contract. Accordingly, the value of this block of timber should not be included in determining the fair market value of the timber subject to the long-term timber cutting contract. Rather these proceeds should be treated as amounts realized pursuant to a sale of timber independent of the long-term contract.It appears that the sale was reported in this manner by Mr. Bridges, Sr. on his 1958 Federal income tax return. Respondent in his notice of deficiency incorrectly included in the value of timber to be cut under the long-term contract, the $276,647.37 value of the 9,221,579 board feet. Not only should the amount be excluded in valuing the timber subject to the contract, but as respondent recognizes in his brief the $276,647.37 should also reduce the stipulated payments of $570,462,29 received by Mr. Bridges, Sr. prior to his death so that the total payments received by him which should be used to reduce the fair*267 market value is $293,914.92. There were two major classifications of timber on the property subject to the cutting contract, merchantable and pre-merchantable. Merchantable timber can be further classified as sawtimber and pulpwood. In determining the fair market value of the timber, both respondent and petitioners start their analyses with the original cruise, and both parties accept the original cruise insofar as the number of stems on the subject property is concerned. Petitioners' expert has made two fundamental changes in the original cruise. First, he has modified the volume tables. It was his opinion that the tree volumes used in the original cruise were low. Accordingly, he substituted his own volume tables, using the original tree count and DBH classes. These volume tables were, in petitioners' expert's opinion, more accurate and comported more favorably with the volume tables currently being used by the timber industry and the U.S. Forest Service. The volume tables used by petitioners' expert witness were not made a part of the record, although the results of their application are reflected in his appraisal report. There is little in the record from which the*268 Court can judge whether the updated more current volume tables are appropriate for valuation of timber as of December 29, 1958. We have accepted the tables used by petitioners' expert for the board feet of 10-inch DBH sawtimber which was considered pulpwood in the cruise report and for topwood which was not considered in the cruise report. However, we have used the volumes, as did respondent's expert, of the cruise report for the pulpwood to be derived from 8-inch DBH and smaller trees. The second major modification of the original cruise made by petitioners' expert witness relates to the breakpoint between pulpwood and sawtimber. The timber cutting contract specifies 12-inch DBH trees as sawtimber. Petitioners' expert used the 10-inch DBH class as the breakpoint between sawtimber and the less valuable pulpwood. This would include 9.1-inch DBH trees. Respondent argues that the correct dividing line between sawtimber and pulpwood was 10.6 inches as the bottom range for sawtimber. In our view, petitioners' line of demarcation is the correct one. The record shows that as of the contract date, the industry standard was to use the 10-inch DBH class as sawtimber. Moreover, as respondent's*269 expert witness conceded, it was the practice of the National Forest Service to include the 10-inch DBH trees as sawtimber in its sales.The use in the timber cutting contract of the 12-inch DBH class as the breakpoint between sawtimber and pulpwood resulted from an agreement of the parties for that contract. This classification is not limiting in determining the fair market value of timber, since the evidence shows that the practice of using 10-inch DBH trees as the breakpoint was widely accepted in the industry. Accordingly, we find that the trees of 10 inches DBH should be valued as sawtimber rather than as pulpwood. The specifications for the original cruise did not call for a determination of the amount of cypress and hardwood sawtimber, but rather called for only cordwood volumes. Respondent takes the position tha the cypress and hardwood timber were suitable only for pulpwood and that hardwood pulpwood had a nominal value of only $2 per cord. Petitioners' expert, however, has submitted data concerning several sales of cypress and hardwood sawtimber around the time of the timber cutting contract. Accordingly, in our view, the cypress and hardwood should be valued as sawtimber.*270 Petitioner contends that the value of the pine sawtimber was $44.06 per thousand board feet, that the value of the cypress sawtimber was $26.36 per thousand board feet and that the value of the hardwood sawtimber was $30 per thousand board feet. Respondent contends that the pine sawtimber should be the same as the value of the 9,221,579 board feet of sawtimber sold concurrently with the signing of the long-term timber cutting contract, i.e., $30 per thousand board feet. However, respondent's expert witness in his valuation report used $32 per thousand board feet for the price of sawtimber. Respondent did not assign any values to the cypress and hardwood sawtimber, as it was the opinion of respondent's expert that the cypress and hardwood were suitable only for pulpwood. In our view, the value of the pine sawtimber not sold immediately at the time the contract was signed exceeded the $30 per thousand board feet paid for the pine sawtimber sold concurrently at the time the timber cutting contract was signed. Owens-Illinois agreed to pay the ad valorem taxes on the property, agreed to maintain the tracts in accordance with good forestry practices, and assumed the risks of losses*271 that could flow from hazards beyond Owens-Illinois' control, such as fire or drought. Because of these considerations, the agreed-upon price for the timber was less than its fair market value. The value of $32 per thousand board feet assigned by respondent's expert witness to the pine sawtimber was based on the average prices paid for pine sawtimber in the three national forests in Florida, on the opinion of J. T. Bridges, Sr. with respect to the fair market values of his standing timber as expressed on his income tax returns for 1956 and 1957 in the fair market values under section 631(a) of his standing timber, and on the prices paid for timber by J. T. Bridges, Sr. in 1956 and 1957 pursuant to timber cutting contracts. The value of $44.06 per thousand board feet assigned by petitioners' expert to the pine sawtimber is an average of the prices received in selected sales primarily in the year 1959. None of these sales used by petitioners' expert involved a block of timber as large as that on the Bridges tracts. However, petitioners' expert stated that in his opinion these higher prices could be received for the Bridges timber by dividing it into smaller lots for purposes of*272 sale. The average of the prices received for timber from all three national forests in Florida is not, in our view, comparable to the price that could have been received for the timber on the Bridges tracts, as the timber in two of those forests was not comparable to the timber on the Bridges lands. We do attribute some significance to the figures Mr. J. T. Bridges, Sr. used as the section 631(a) fair market values of timber on his tax returns, as Mr. Bridges was quite an expericenced dealer in timber. In addition, we consider the sales prices received from sales of timber in the Oceola National Forest as relevant in determining the fair market value of the sawtimber on the Bridges tracts although we have disregarded two sales which appear to have brought unexplainable high prices. Based on these considerations, we have found the value of the pine sawtimber not sold concurrently at the time of the signing of the longterm timber contract to be $35 per thousand board feet. The information upon which we can determine the fair market value of the cypress and hardwood sawtimber is much less extensive. Respondent has presented no evidence of comparable sales. Based on the comparable*273 sales presented by petitioner, we find the value of the hardwood sawtimber to be $30 per thousand board feet. The sparse evidence of value of the cypress sawtimber was for such small quantities, we consider some adjustment necessary. From all the available evidence we have found the value of the cypress sawtimber to be $25 per thousand board feet. Petitioners assign the following fair market values to the various types of pulpwood. pine, $8.93 per cord; cypress, $3.50 per cord; and hardwood, $2.50 per cord. Respondent values the pine pulpwood at $6 per cord and the cypress and hardwood pulpwood at $2 per cord. The lower limit for classification as pulpwood in the original cruise was a 3.6-inch diameter. Experts for both sides agree that this cutoff point is the minimum acceptable for classification as pulpwood. Petitioners' expert has decreased the volume of pulpwood on the Bridges tracts by the volume of the 10-inch trees, a measure which we have heretofore approved. In addition, petitioners' expert has increased the amount of pulpwood on the property by the volumes of the top wood of the sawtimber trees. This timber could not have been used as sawtimber, but, in our view, was*274 correctly designated as pulpwood. Finally, petitioners have increased the voluem of the pulpwood by reason of the substituted volume tables. As heretofore stated, there is not sufficient evidence available to support the use of these substitute tables. We have therefore found the cords of pulpwood for pine trees as determined in the cruise report less the pulpwood shown in that report to be derived from 10-inch DBH trees. We have used petitioners' figures for cypress and hardwood pulpwood since so much of this wood we have agreed with petitioners was sawtimber that we consider it more accurate to use the tables used by petitioners' expert for all these threes. With respect to pine pulpwood, petitioners' expert produced a number of sales, including several sales by the U.S. Forest Service from the Osceola National Forest. Some of the sales are too far removed in time from December 29, 1958 to be meaningful. We have set forth the sales we consider to be helpful in our findings. Respondent relies upon the section 631(a) per cord fair market values of $6 per cord as reported by J. T. Bridges, Sr. on his Federal income tax return for 1958. Respondent also relies upon the price allocations*275 pursuant to various short-term timber cutting contracts between J. T. Brdiges, Sr. and others, as reflected on depletion schedules on J. T. Brdiges, Sr.'s income tax returns for the years 1956 and 1957. These schedules allocate a value of $5.14 per cord to pine pulpwood in 1956 and $5.77 per cord to pine pulpwood in 1957. Finally, respondent relies upon the average prices received for pine pulpwood in Florida sales by the U.S. Forest Service during 1957, 1958 and 1959. These average per cord prices were $8.11 in 1957, $6.97 in 1958 and $6.92 in 1959. The timber on the J. T. Bridges, Sr. lands was superior to the timber in two of the national forests in Florida, and was comparable to the timber in the Oceola National Forest. Accordingly, we consider the sales out of the Osceola National Forest to be the most comparable to sales of pulpwood on the Bridges tracts. None of the sales cited by petitioners is of a quantity of timber approximating the amount of pulpwood on the Bridges tracts. Based on all the evidence available, we have found the fair market value of pine pulpwood on the Bridges tracts as of the contract date to be $8 per cord. There were no substantial sales of cypress*276 and hardwood pulpwood around the contract date. Neither party cites any sales data with respect to the fair market value of the cypress or hardwood pulpwood, although both parties were of the opinion that the values of cypress and hardwood pulpwood were minimal. Based on the evidence available, we have found the value of the cypress and hardwood pulpwood to be $2.50 per cord. Petitioners contend that the value of the premerchantable timber is $1,269,719.79. Respondent assigned a value of $63,687 to the pre-merchantable timber. The pre-merchantable timber presents a difficult problem because it had no fair market value as of the contract date and could not have been sold without the simultaneous conveyance of an interest in the land or of the future right to cut timber. Petitioners' expert determined that the average pre-merchantable stem would reach maturity in 15 years, i.e. 1974. He determined the number of cords that the mature trees would render and determined the value in 1974 by using the actual per cord price of $32.55 received in 1974. He then discounted this value (at a 6 percent rate) to determine the value as of the contract date. Petitioners' expert's analysis benefits*277 from hindsight. He knew the actual prices of timber in 1974. As petitioners' expert himself freely admitted, no one could have accurately predicted as of the contract date the sales prices of pulpwood in 1974 and it is doubtful that anyone could have predicted that the per cord prices would have quadrupled over a 15-year period. Moreover, use of petitioners' expert's formula has the curious result of placing a higher per stem value on the 2-inch DBH pine timber than on the merchantable 8-inch DBH pine timber. The increased costs of maintenance during the maturation period of the immature trees were not accounted for by petitioners' expert witness. Nor, in our view, does the six percent interest rate used by petitoners' expert witness adequately account for the risks from fire, disease, drought, or other disaster beyond an individual's control.Petitioners' expert witness admitted that consideration of these risks might have resulted in his application of a different interest rate. On brief, perhaps in recognition of the weakness of their expert's appraisal methodology with respect to the pre-merchantable timber, petitioners suggest alternative methods of valuation including averaging*278 the estimates of value of both parties and applying a percejtage offset of petitioners' expert's value. Respondent's expert witness determined that some 300,000 of the pre-merchantable stems would not reach maturity. He then computed the volume that the surviving stems would produce in 20 years and determined the value of this timber to be the $6 per cord he had determined to be the value per cord of pine pulpwood at December 29, 1958. In this manner he arrived at a total value of $246,468. Respondent's expert then discounted this computed value by a formula, (246,468 X 1 / (1 +.07) 20 or 1 / 3.87) which he testified was accepted in the forestry industry, at the rate of seven percent to determine the fair market value. At trial respondent's expert witness testified that the pre-merchantable timber would have had no value to Owens-Illinois, as the company have preferred to have the land cleared so that new trees could have been planted.In our view, the original cruise accounted for trees that wouldnot have survived to maturity. Consequently, it was unnecessary for respondent's expert to further reduce the number of pre-merchantable stems. In addition, it appears that a maturation*279 period of 15 years, rather than a 20-year period, would have been sufficient for the average tree to reach maturity, as the premerchantable trees had an average age of approximately five years. As suggested on brief by petitioners, we have used respondent's witness' formula. We have accepted petitioners' witness' estimate that the trees would average 7.5 inches DBH after 15 years but have used the volume tables used in the cruise report which results in.076 cords per tree. We have used a 15-year maturation period, and a value at maturity of $8 per cord, the value we found as of December 29, 1958. In addition, we have used a seven percent interest rate, as this is the average net annual growth rate for slash pine in North Florida and South Georgia. Using this formula, and rounding off the amounts, we have determined that the premerchantable timber had a fair market value of $285,000 as of the contract date. 4 This appears to be a reasonable sum for the pre-marketable stems in view of the other values we have determined. The*280 final issue is whether the assessment and collection of the deficiencies in income tax with respect to petitioners E. S. Chandler and Virginia B. Chandler and petitioner Virginia B. Chandler are barred by the statute of limitations. At trial respondent introduced executed copies of three Forms 872, consents fixing the period of limitations upon assessment of income tax, executed by petitioners E. S. Chandler and Virginia B. Chandler and by petitioner Virginia B. Chandler and on behalf of the Commissioner. The signatures on these copies match the signatures of these petitioners on their returns. The originals of the Forms 872 had been lost, but the copies were stapled to the returns of these petitioners. In our view the so-called copies are duplicate originals.A "control card" routinely maintained by the audit review staff in the office of the Jacksonville District Director of the Internal Revenue Service also indicated that petitioners E. S. Chandler and Virginia B. Chandler and petitioner Virginia B. Chandler had signed Forms 872 for the years in issue. Respondent could offer no explanation as to the whereabouts of the originals of these Forms 872. We are nevertheless satisfied*281 that the copies, or duplicate originals, submitted establish that the consent forms were filed. Accordingly, assessment and collection of the deficiencies in income tax of petitioners E. S. Chandler and Virginia B. Chandler and of petitioner Virginia V. Chandler are not barred by the statute of limitations. Decisions will be entered under Rule 155. Footnotes1. Cases of the following are consolidated herewith: Estate of Addie Belle B. Edwards, Deceased, J. T. Bridges, Jr., Co-executor, docket No. 1027-77; Peter F. Edwards, Surviving Husband of Addie Belle B. Edwards, docket No. 1028-77; Charles H. Sabin, III and Marilyn B. Sabin, docket No. 1029-77; Virginia B. Chandler, docket No. 1030-77; E. S. Chandler and Virginia B. Chandler, docket No. 1031-77; and Jack E. Brooks and Janice B. Brooks, docket No. 1032-77.↩2. The statutory notices of deficiency set forth the deficiencies by individual years. However, since respondent states on brief that a recomputation under Rule 155 will be needed regardless of our determination of the issue presented for decision, we did not consider it necessary to set forth this detail. By amendment to answer respondent claimed increased deficiencies, but on brief conceded the issue that gave rise to these claims.↩*. Prior to her marriage to Peter F. Edwards, Addie Belle B. Edwards was the surviving spouse of J. T. Bridges, Sr. ↩**. Peter F. Edwards is the surviving husband of Addie Belle B. Edwards. The tax in this case is a duplication of that set forth in Docket No. 1027-77.↩3. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here involved. Under section 631(a) the difference between the taxpayer's basis of timber cut during each taxable year and its fair market value as standing timber on the first day of the taxable year is treated as gain or loss from a sale or exchange under section 1231↩. In determining the January 1 fair market values of the standing timber for purposes of Mr. Bridges' Federal income tax returns, no exhaustive study was conducted to determine comparable prices. Rather, the January 1 values were determined primarily on the basis of J. T. Bridges, Sr.'s conclusions as to the fair market value of the timber.*. 9,334,880 Bd.Ft. Scribner↩4. See Estate of J.T. Bridges, Sr. v. United States,25 AFTR 2d 70↩-1495, 70-1 USTC par. 12,663 (M.D. Fla. 1969).*. This is the MBd ft after substracting the 9,221,579 Bd Ft for which Mr. Bridges was paid cash when he entered into the contract.↩4. The computation is as follows: 1,291,694 (trees) X.076 = 98,168 98,168 X $8 = $785,350 $785,350 X 1 / (1 +.07) 15 or 1 / 2.76 = $284,547↩